Hillsborough
No. 84-536

THE STATE OF NEW HAMPSHIRE

v.

DANA CHAMPAGNE

August 16, 1985

*Stephen E. Merrill*, attorney general (*Andrew L. Isaac*, assistant attorney general, on the brief and orally), for the State.

*Joanne S. Green*, assistant appellate defender, of Concord, by brief and orally, for the defendant.

*Hage and Hodes*, of Manchester (*Paul W. Hodes* on the brief and orally), as guardian ad litem for the defendant.

DOUGLAS, J. The Superior Court (*Pappagianis*, J.) transferred the following questions, with rulings, to this court pursuant to RSA 491:17 and Supreme Court Rule 8: (1) whether the record in the case

thus far supports the court's ruling that the defendant is competent to stand trial; and (2) whether a finding that a defendant is competent to stand trial requires a finding, as a matter of law, that he is also competent to enter a plea of not guilty by reason of insanity.

The court also transferred a number of questions without rulings relating to the ability of the guardian ad litem to plead for the defendant and the need for another competency hearing after the decision of this court. SUP. CT. R. 9. For the reasons which follow, we answer the first question in the negative and reverse the court's ruling that the defendant was competent to stand trial. We answer the second question in the affirmative and affirm the court's ruling that the defendant was incompetent to enter a plea. Because of our disposition of the questions transferred with rulings, we will not address the questions transferred without rulings.

The defendant, Dana Champagne, was indicted on October 4, 1983, for second degree murder in the stabbing deaths of his parents. On that date he was admitted to the forensic unit at the New Hampshire Hospital for stabilization of his mental condition.

Between 1973 and 1983 the defendant had been admitted to psychiatric hospitals on seven occasions. He is psychotic, suffering from paranoid schizophrenia, and has been operating under the same active delusional system for ten or twelve years. These delusions revolve around a theory that there are people, whom he calls "flesh eaters", who catch and sell and eat other people. It was on the belief that his parents were among this group, and that God had ordered him to do so, that the defendant killed them. The defendant sees the "mark of the beast" on the Pope, President Reagan and others.

On March 13, 1984, a hearing was held before the Court (*Flynn*, J.) to determine the defendant's competency to stand trial. Dr. Edward L. Rowan, testifying for the State, gave the opinion that, while he believed the defendant was competent when he interviewed him on December 15, 1983, he was not sure whether the defendant currently had a rational understanding of the proceedings. Dr. Paul Emery, a forensic psychiatrist, testified that, at the State's request, he had examined the defendant. Although he had concluded on February 2, 1984, that the defendant was competent, he now believed the defendant was incompetent because he was not rational. The court found the defendant incompetent to stand trial and ordered him committed to New Hampshire Hospital for the purpose of treatment directed towards his becoming competent. The court also suspended the criminal proceedings until May of 1984, to which the defendant excepted and asserted his right to a speedy trial.

A second competency hearing was held on May 15, 1984, before *Dalianis*, J. Dr. Rowan testified that he believed the defendant was

now competent to stand trial. He based this opinion largely on the fact that the defendant was currently taking antipsychotic medication administered by the hospital to enable him to control his own thoughts. Also greatly influencing Dr. Rowan's opinion were recent statements by the defendant to the effect that, if he were to be found incompetent, he would be committed to the Brown Building at the New Hampshire Hospital, where civil committees are housed and where security is less restrictive than at the forensic unit.

Dr. Emery testified on behalf of the defense, although he had been retained in the case by the State. He had spoken with the defendant for thirty-five minutes the previous night and concluded that his mental condition was the same as in March and that he remained incompetent. Although agreeing with Dr. Rowan that the defendant has, at times, a limited *factual* understanding of the proceedings, Dr. Emery believed the defendant lacked a *rational* understanding due to his active delusional system. The defendant, he testified, is liable at any time to retract his apparent factual understanding and, under his delusions, change his view of the actual nature of the proceedings. This, according to Dr. Emery, also prevents the defendant from rationally consulting with his attorney, as does the looseness of his thinking. Dr. Emery based these conclusions on the length of his interview with the defendant, stating that one might rely on the defendant's first answer to any given question "but as the interview progressed and at sufficient length, you get comments that are the opposite because there is no rational basis." Although Dr. Emery admitted that the defendant may have an interest, as most people would, in going to the Brown Building rather than being criminally committed, he would not agree that the defendant manipulates his psychosis to further that intent. On May 17, 1984, *Dalianis*, J. ruled that the defendant was competent to stand trial.

On May 31, 1984, the third and final hearing on the defendant's competency was held before *Pappagianis*, J. Dr. Rowan and Dr. Emery again testified for the State and for the defendant, respectively. Their testimony remained largely unchanged from the previous hearing. Dr. Rowan again stated that in his opinion the defendant was competent. He based this opinion on a fifteen-minute conversation with the defendant that morning, during which the defendant communicated a factual understanding of the principals in the trial and their respective roles.

Dr. Emery again testified that in his opinion the defendant was incompetent, based on a forty-five minute interview a few days before. He maintained his belief that the defendant lacked both a rational understanding of the proceedings and an ability to consult rationally or reasonably with his attorneys.

The defendant himself testified for the first time at the May 31 hearing. Although he understood that the jury hears the facts and is "supposed to prove" his guilt or innocence, he did not know if there would be flesh eaters on the jury, but if there were, they would know that he was supposed to destroy them. As for his understanding of the role of the judge, Dana saw the "mark of the beast" on the judge and stated his belief (albeit a minority view) that judges "go back to the spirits of devils and they tell them what to do. Lucifer is their boss." As for his lawyers, Dana did not know whether or not they are among the people who do things that are "beyond the deeds of wickedness."

On September 4, 1984, the court ruled that Dana was competent to stand trial but incompetent to enter a plea of not guilty by reason of insanity. The court then directed that counsel prepare an interlocutory appeal regarding its rulings and also formulated questions without ruling for consideration by this court.

■■ A criminal defendant has a constitutional right not to be tried if he is legally incompetent. *Pate v. Robinson*, 383 U.S. 375, 378 (1966); *State v. Bertrand*, 123 N.H. 719, 724–25, 465 A.2d 912, 914 (1983). "[T]he mental competence of an accused must be regarded as an absolute basic condition of a fair trial." *State v. Cook*, 104 R.I. 442, 445, 244 A.2d 833, 835 (1968).

■■ The test of competency is "whether [a criminal defendant] has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as [a] factual understanding of the proceedings against him." *Dusky v. United States*, 362 U.S. 402, 402 (1960); *Bertrand, supra* at 725, 465 A.2d at 914. The *Dusky* test is thus two-pronged. First, the defendant must have a sufficient present ability to consult with and assist his lawyer with a reasonable degree of rational understanding. Second, he must have a rational as well as a factual understanding of the proceedings against him. We hold as a matter of law that the State here did not meet its burden of proving by a preponderance of the evidence, *Bertrand, supra* at 727, 465 A.2d at 916, that the defendant has the ability to consult with his lawyer with a reasonable degree of rational understanding and that he has a rational understanding of the proceedings against him so that he may be determined competent to stand trial.

■ The defendant, at least at times, has demonstrated a factual understanding of the proceedings. He can articulate what the roles of the judge, jury, prosecutor, and defense counsel are supposed to be. He stated that he understands that he is charged with murder

for which he could do a "lot of time" if convicted. He is oriented as to time, place, and person. If this were the extent of the test for competency, the record would support the trial court's ruling. However, merely a factual understanding, whereby the defendant can recite, civics-class style, the cast of characters, their roles and the object of the proceedings, and can recall some events, is not enough. The defendant must also have a rational understanding of the nature of the charges brought against him and the purpose of the trial proceedings based upon those charges. He must also have the ability to communicate *meaningfully* with his lawyer so as to be able to make informed choices regarding trial strategy. This often involves decisions of constitutional moment such as whether to waive the right against self-incrimination by taking the stand to testify. *See generally, Schade v. State*, 512 P.2d 907, 913–14 (Alaska 1973); *State v. Cook, supra* at 446–47, 244 A.2d at 835–36. The trial court erred in applying the *Dusky* standard by focusing narrowly upon the defendant's *factual* understanding capabilities.

In its order, the court recognized that the defendant "has a basic psychotic thought disorder that is manifested in the form of delusions and hallucinations and in the form of 'looseness of association, which is the juxtaposition of illogical ideas and words; *problems of volition;*' problems of affect 'which means the emotion does not always agree with the expressed ideas;' paranoia, 'primarily' that President Reagan and the Pope are conspiring to put him in the State Prison; and homosexual fear." (Quoting expert testimony at trial; emphasis in the original.)

■ While the presence of mental illness is certainly not conclusive of incompetence, the nature and severity of a defendant's illness, as well as the effect of appropriate medication, should be a significant consideration in judging competence. *See State v. Cook, supra* at 445, 244 A.2d at 835; Note, *Incompetency to Stand Trial*, 81 HARV. L.R. 454, 459–61 (1967). In the present case, the severity of the defendant's mental illness is undisputed. He has been diagnosed as psychotic, suffering from paranoid schizophrenia. This psychosis has caused him to be admitted to psychiatric hospitals seven times in the ten years previous to when he killed his parents.

While recognizing the severity of the defendant's mental illness, the court nevertheless found the defendant competent to stand trial. It apparently based this finding on the testimony of Dr. Rowan, whose change of opinion regarding the defendant's competence was apparently influenced by the effect of antipsychotic medication upon the defendant and by the perception that the defendant might be malingering in order to avoid commitment to the State prison. We

cannot agree that these considerations demonstrated that the defendant had a rational understanding.

Dr. Rowan testified that the medication had no effect upon the delusional system under which the defendant operated. The defendant's world of flesh eaters, marks of the beast, etc. "is always there, even when Dana is doing very well, and when he seems to be stressed, it seems to come more to the forefront."

At the third competency hearing, Dr. Rowan agreed that the defendant still believes that President Reagan and the Pope are "ganged up on him during this pending criminal matter" and that "[t]o some degree" the judge and jury are involved in the conspiracy. According to Dr. Rowan, the defendant had said that jurors "might be influenced in order to send him to jail. He did not say that the prosecutor was, which is different." When asked if the defendant still believes the judge is being controlled by outside forces, Dr. Rowan answered, "I believe he thinks he might be but I don't think he believes that he is definitely." Agreeing that it would not be rational if Dana believes that there are flesh eaters on his jury, whose verdict would be thus influenced, Dr. Rowan admitted that he did not ask the defendant whether he believed there would be flesh eaters on his jury. He also did not ask him whether the judge would be influenced.

Dr. Rowan's conclusions regarding the defendant's rational understanding are further undermined by his limited contact with the defendant and his failure to probe beyond the surface of the defendant's mental awareness. Dr. Rowan had spoken only very briefly with the defendant prior to the competency hearing. He had not reviewed ward notes during the two weeks prior to that hearing. Dr. Rowan admitted that he had gleaned most of his information from staff discussions, ward observations, etc., and had little direct prolonged contact with the defendant.

Dr. Emery agreed with Dr. Rowan that the medication had not affected the defendant's delusional system and that it had left his mental condition substantially unaffected. In contrast with Dr. Rowan, however, Dr. Emery concluded that the defendant's delusional system so imbued the defendant's thought process that he could not rationally understand the nature of the proceeding against him or rationally communicate with his lawyer. Dr. Emery testified that the defendant's

> "understanding, the understanding that he projects into the judicial proceeding, that he projects into his relationship with his attorney is so influenced by his delusional system that I find it hard to think of rationality in terms

of the way he expresses himself talking about the trial or talking about his defense."

The defendant himself testified at the third competency hearing. His testimony corroborates Dr. Emery's conclusion that the defendant's delusions cause an inability to rationalize his factual observations. The transcript reveals that when asked questions requiring a "yes" or "no" response, the defendant appeared to have an understanding of the proceedings. If the questioning proceeded at any length, however, the defendant's delusions and looseness of association took over, so that his first answer would not be a reliable indicator of his thinking. The following exchange is illustrative of the defendant's inability to internalize rationally his factual understanding of trial proceedings:

"Q. And are they [the jury] supposed to be fair people?

A. Yeah.

Q. If you had a jury in this trial would there be any flesh eaters on the jury?

A. I don't know.

Q. If they were flesh eaters would they be impartial towards somebody like you?

A. Yes.

Q. They would?

A. They know that I'm supposed to destroy them.

. . .

Q. Would they like you knowing that you were—

A. They would probably laugh at me like a joke because they think they're mighty people on this earth, strong people, but they're not."

The defendant's testimony also undermines the contention that the defendant was malingering, since many of his responses were inappropriate to an attempt to feign mental incompetence. Dr. Emery's testimony regarding this issue also demonstrated that the likelihood of malingering in this defendant was extremely low. Dr. Emery pointed to the defendant's eleven-year constant history of medical disorders, and his frequent admissions to psychiatric hospitals, to underscore the persuasiveness and legitimacy of the defendant's malady.

Although, strictly speaking, it is not necessary to address the court's second transferred question, given our answer to the first, the issues involved in each are somewhat intertwined, the more so

because of the court's findings and rulings in this most difficult case. The court recognized that the same test, the *Dusky* test, is used for deciding whether a defendant is competent to plead not guilty by reason of insanity and for deciding whether a defendant is competent to stand trial. *Cf. Roy v. Perrin*, 122 N.H. 88, 94, 441 A.2d 1151, 1155 (1982).

The court went on to state, however, that:

> "Although the test is the same in both situations, it focuses on a defendant's understanding of the proceedings against him: Obviously, trial proceedings against a defendant are different from proceedings at which a defendant pleads not guilty by reason of insanity. The proceedings being different, the standard, as applied, also differs. A defendant may understand what is involved in standing trial but may not understand that by pleading he is waiving a variety of constitutional rights."

For this reason, the court held that "[a] finding and ruling that Mr. Champagne is competent to stand trial does not encompass as a matter of law a finding and ruling that he is competent to plead not guilty by reason of insanity; nor is the converse true." We disagree.

We recently had occasion to discuss whether "the constitutional standard of competence varies with the trial decision in question." In *State v. Faragi*, 127 N.H. 1, 9–10, 498 A.2d 723, 729 (1985), we held that *"Dusky* provides the appropriate standard against which the existence of reasonable doubt about competence must be assessed" for judging competence not only to stand trial but also to waive an insanity defense. *Id.* There is no reason to distinguish the competency necessary to an insanity defense from that needed to plead not guilty by reason of insanity. We hold then that a defendant cannot be competent for some trial proceeding purposes and incompetent for others. He is either competent or he is incompetent.

Having said that, we note that the trial court found and ruled that:

> "2. Mr. Champagne's delusions do not affect his capacity to recall and narrate the facts to his trial lawyers and to his guardian ad litem, and do not affect their ability to understand the facts and to render effective assistance of counsel.
>
> 3. Mr. Champagne's delusions do affect his capacity to enter a plea of not guilty by reason of insanity in his own behalf, and his entry of such a plea personally would not be voluntary and intelligent."

In support of this latter finding the court stated:

> "[The defendant's] delusions, or irrationality, would make his plea involuntary and unintelligent. He thinks he is sane and was justified in killing his parents. He is not a rational person unwilling or unable to admit his guilt, . . . but an irrational person willing to admit his guilt and unwilling or unable to admit his irrationality. His plea would not be voluntary by reason that he thinks that the Pope and President Reagan have conspired to send him to State Prison, and he thinks that he might get killed or that he might be attacked homosexually at the prison. He wants to avoid being sentenced to the prison. He knows that a plea of not guilty by reason of insanity would lead to his commitment to the New Hampshire Hospital. His plea would not be intelligent by reason that he thinks he killed his parents on God's order, and he cannot understand why he should be accused of murdering them and be subjected to the judicial proceedings he is experiencing, when he was justified in carrying out God's order and did 'justice.' His plea would not be voluntary and intelligent by reason that he thinks some of the jurors might be flesh eaters who would find him guilty for the hell of it, resulting in his being sentenced to the State Prison, where he does not want to go." (Citation omitted.)

The basis of the court's ruling, that the defendant was incompetent to enter a plea which had been knowingly and intelligently made, is inconsistent with its determination that he was competent to stand trial; and it further supports our holding that the evidence does not support a finding that the defendant is competent to stand trial.

■■ Accordingly, question 1 of the transferred questions is answered in the negative, and question 2 is answered in the affirmative.

*Reversed in part; affirmed in part; remanded.*

All concurred.