Merrimack
No. 99-710

THE STATE OF NEW HAMPSHIRE

v.

BURTON MICHAEL GOURLAY

Argued: March 13, 2002
Opinion Issued: July 22, 2002

*Philip T. McLaughlin*, attorney general (*Ann M. Rice*, senior assistant attorney general, on the brief and orally), for the State.

*Swope & Nicolosi, P.L.L.C.*, of Concord (*Diane M. Nicolosi* on the brief and orally), for the defendant.

BROCK, C.J. The defendant, Burton Michael Gourlay, appeals his first degree murder conviction. RSA 630:1-a (1996). He argues that the Superior Court (*McGuire*, J.) erred by finding him competent to stand trial and by excluding his expert psychologist's testimony regarding his ability to formulate the requisite *mens rea* to commit the charged offense. We affirm.

The following facts are supported by the record. In June 1998, the defendant was charged with first degree murder for acting in concert with and aiding Leslie Noonan and Kenneth Munson in the strangling death of Brian McManis. The victim's body was recovered from the Merrimack River after Noonan reported the incident to the police. Subsequently, the police arrested the defendant along with Munson. At the police station, the defendant gave a taped interview during which he described the events of the murder and made incriminating statements.

In December 1998, a hearing was held to determine the defendant's competency to stand trial. Dr. Albert Drukteinis, the psychiatric expert for the State, testified that while the defendant had a cognitive impairment, which was caused by a self-inflicted gunshot wound to his head in 1986, long-term alcohol abuse, and a prior learning disability, it did not render him incompetent to stand trial. Dr. Donald Davidoff, testifying for the defense, offered his conclusion that the defendant's cognitive impairments rendered him incompetent to stand trial. The trial court found that the defendant's cognitive deficits did not render him incompetent to stand trial.

A second competency hearing was held in September 1999. At this hearing, the defendant testified. The court stated that while the defendant "suffers from certain cognitive deficits," he was able to communicate with

his attorney, was "oriented as to time, place and person," and was able to narrate a detailed account of the events surrounding the charged offense. Also, the court found that "[t]he defendant [had] demonstrated the ability to consider the advice of counsel and make his own decisions."

In October 1999, a hearing was held to determine, among other things, whether the defendant could present Dr. Davidoff's testimony to rebut the State's evidence that the defendant acted purposely in the murder of Brian McManis. The trial court ruled that "[e]xpert psychiatric evidence is not admissible on the issue of the defendant's ability to form criminal intent, as New Hampshire has not recognized the 'diminished capacity' defense."

Upon conclusion of the guilt phase of the trial, the jury found the defendant guilty of first degree murder. In the second phase of the trial, the jury considered his insanity defense and found the defendant sane. This appeal followed.

## I

The defendant first argues that the trial court erred in finding him competent to stand trial. We address the defendant's State constitutional claim first, citing federal law only to aid in our analysis. *State v. Ball*, 124 N.H. 226, 233 (1983). Because the Fourteenth Amendment to the United States Constitution provides no greater protection to the defendant than Part I, Article 15 of the State Constitution, we need not conduct a separate due process analysis under the Federal Constitution. *See State v. Zorzy*, 136 N.H. 710, 714 (1993).

A criminal defendant has a constitutional right not to be tried if he is legally incompetent. *See id.* "The mental competence of an accused must be regarded as an absolute basic condition of a fair trial." *State v. Champagne*, 127 N.H. 266, 270 (1985) (brackets and quotations omitted). The two-pronged test for competency requires that a defendant have: (1) a sufficient present ability to consult with and assist his lawyer with a reasonable degree of rational understanding; and (2) a factual as well as rational understanding of the proceedings against him. *See State v. Haycock*, 146 N.H. 5, 6 (2001); *see also Dusky v. United States*, 362 U.S. 402, 402 (1960). The burden is on the State to prove, by a preponderance of the evidence, that the defendant is competent to stand trial. *See Haycock*, 146 N.H. at 6.

The defendant challenges the trial court's decision only with respect to the first prong of the test. To be competent within the meaning of the first prong of the test, the defendant must be able to communicate meaningfully with his attorney "so as to be able to make informed choices regarding trial strategy." *Champagne*, 127 N.H. at 271. The test requires

that the defendant have more than just a factual understanding of the charges against him. *See id.* He must be sufficiently coherent to provide his counsel with the information necessary to construct a defense. *See* Note, *Incompetency to Stand Trial*, 81 HARV. L. REV. 454, 459 (1967).

Dr. Davidoff testified that the defendant's impairments resulted in him having difficulty with memory, organization, planning and receptive language, as well as difficulty with thinking flexibly and sustaining attention. Applying the *Dusky/Champagne* standard, Dr. Davidoff concluded that these cognitive deficiencies rendered the defendant incapable of effectively communicating with his attorney.

On the other hand, while Dr. Drukteinis agreed that the defendant had "some cognitive or brain impairments," he concluded that under the *Dusky/Champagne* standard, the defendant would be competent to stand trial because "his memory for the events surrounding the crime was not significantly impaired and he was able to relate those events in at least a logical manner to the police" and to him. Dr. Drukteinis noted that it was significant that the defendant was able to relate the same account of the charged event to him as he gave the police six months prior in his taped statement. Because the defendant was able to provide good factual detail of the incident and answer questions regarding it, the doctor opined that he could do the same "in a reasonable way and in a rational way" with his attorney.

The defendant asserts that the court should have rejected Dr. Drukteinis' testimony because he based his conclusions on insufficient clinical tests, a two and one-half hour interview, and medical and police reports, while the defendant's expert conducted extensive testing.

■ "The weight to be given testimony depends on the credibility of the witnesses, and the credibility of witnesses is for the trial court to determine." *Roy v. Perrin*, 122 N.H. 88, 94 (1982). Relying upon the State's expert, the trial court found that the defendant's cognitive deficits did not render him incompetent to stand trial because "[h]e has a sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding and has a rational and factual understanding of the proceedings against him." We cannot find that no reasonable person could have come to the same conclusion as to the weight to be given to the conflicting testimony in this case; we, therefore, defer to the trial court. *See State v. Hardy*, 120 N.H. 552, 554 (1980).

The defendant argues that because of his mental deficits, he was "unable to discuss in an informed way issues central to his case," such as, among other things, whether to assert an insanity defense and whether to accept a negotiated disposition. The trial court found that the defendant's

mental deficits did not render him incapable of strategizing with his attorneys and that he understood the potential consequences of being found insane. He did not believe that he was insane and did not wish to be placed in a secure psychiatric unit. On cross-examination, the defendant stated that, while he was not happy with an insanity defense, he would seriously consider his attorney's advice. The fact that he testified that he would think about the defense if his attorneys recommended it and the fact that he ultimately asserted the defense demonstrates that he was able to strategize.

In addition, the defendant's rationale for stating that he would refuse a negotiated plea does not necessarily mean that he could not understand the consequences. The defendant maintained that he is innocent and he stated that he mistrusts "plea bargains." He did, however, testify that depending on what the offer was, he may consider it. The trial court found that this demonstrated his ability to consider the advice of counsel and make his own decisions. We agree.

The defendant argues that he could not communicate meaningfully with his attorney because he had little or no understanding of the evidence against him or of the highly incriminating nature of his confession and his statements at the competency hearing. While the defendant's admission that he held down the victim and even hit him was incriminating, it demonstrated his ability to strategize because he was attempting to show that his participation was minimal compared to Munson's.

The defendant also contends that he could not communicate meaningfully with his attorney because of his problem of confabulation, which is an unconscious back-filling of memory gaps with fabricated events. Dr. Davidoff testified that the defendant's confabulations included the following: The defendant claimed that during the murder he saw the victim die after he was strangled and then come back to life; he stated that, after the murder, he watched the police recover the victim's body from the river; and he refused to admit that he shot himself in the head in 1986, instead claiming that his head wound, resulting from that gunshot wound, was caused by a hammer falling on him and that he had undergone head surgery and was in the hospital due to headaches. The defendant asserts that while he may appear to relate the events of the murder consistently, his tendency to confabulate casts doubt upon whether his version of the events was true.

Dr. Drukteinis testified that the defendant did not confabulate regarding the crime. He offered that a logical explanation of why the defendant claimed that the victim died and came back to life is that the victim likely lost consciousness after being strangled, appeared dead, and then was revived. Also, the defendant's account that he and Munson

watched the police retrieve the victim's body from the opposite bank of the river was plausible and corroborated by physical evidence. Further, the rest of the defendant's description of the murder was corroborated by physical evidence and witness testimony. With regard to other incidents the defendant confabulated, namely, that a hammer caused his head wound, Dr. Drukteinis attributed this to an amnestic period resulting from his gunshot wound. This amnestic period also contributed to why he was found incompetent to stand trial for the previous criminal charge that caused him to shoot himself. The trial court relied upon the State's expert in finding that the defendant's account of the murder was "plausible and consistent" and "corroborated by physical evidence and otherwise." The evidence supports this finding.

The defendant argues that Dr. Drukteinis applied an improper competency standard when he testified that the defendant would be incompetent to assert an insanity defense but was otherwise competent. The defendant relies upon *Champagne,* where we held that "a defendant cannot be competent for some trial proceeding purposes and incompetent for others. He is either competent or he is incompetent." *Champagne,* 127 N.H. at 274. The defendant's argument is misguided. Dr. Drukteinis did not conclude that the defendant was incompetent to assert an insanity defense. Rather, he stated that if the defendant were truly insane and refused to consent to an insanity defense, then he would be incompetent. Dr. Drukteinis testified, however, that he did not believe that the defendant was insane. Therefore, we conclude that he did not apply an improper competency standard.

The defendant lastly argues that the trial court should have rejected Dr. Drukteinis' testimony because he erroneously stated that lawyers can make fundamental decisions for their clients and may advance an argument based on a client's mental deficits without the client's consent. Assuming without deciding that Dr. Drukteinis did in fact make these assertions, we need not find that his testimony should have been rejected, because the trial court did not base its finding on this portion of the testimony.

## II

The defendant argues that because the trial court excluded expert psychological testimony on the issue of intent, he was deprived of his rights to present all proofs favorable, to present a defense, and to a fair trial as guaranteed by Part I, Article 15 of the New Hampshire Constitution and the Fifth and Fourteenth Amendments to the United States Constitution.

The defendant asserts that the evidence is admissible under New Hampshire Rule of Evidence 702, which provides: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert . . . may testify thereto in the form of an opinion or otherwise." Such testimony "is not objectionable solely because it embraces an ultimate issue to be decided by the trier of fact." N.H. R. Ev. 704. An important factor affecting its admissibility is whether the expert testimony "will aid the jury in its search for the truth." *State v. St. Laurent*, 138 N.H. 492, 495 (1994); *see also* N.H. R. Ev. 702 reporter's notes. "The question is whether the witness, by either study or experience, has knowledge on the subject matter of his or her testimony so superior to that of people in general concerning it that his or her views will probably assist the triers of fact." *St. Laurent*, 138 N.H. at 495 (quotations omitted). The trial court has wide discretion in admitting or excluding expert opinion, and we will not reverse its decision unless we find an unsustainable exercise of discretion. *State v. James*, 140 N.H. 50, 51 (1995); *cf. State v. Lambert*, 147 N.H. 295, 296 (2001) (explaining unsustainable exercise of discretion standard). To show that the trial court's decision is not sustainable, the defendant must demonstrate that the court's ruling was "clearly untenable or unreasonable to the prejudice of his case." *Lambert*, 147 N.H. at 296.

In *St. Laurent*, the defendant appealed his conviction of first degree assault, where he had pled not guilty by reason of insanity. *See St. Laurent*, 138 N.H. at 493. At a pretrial hearing, the defendant moved for a ruling on the admissibility of the testimony of his expert psychiatrist regarding his inability to formulate the requisite intent to commit the charged offense. *See id.* The trial court denied the defendant's motion, holding that "diminished capacity is not a defense adopted in New Hampshire." *Id.* at 494 (quotation omitted). On appeal, we determined that the defendant was not advocating a new defense of diminished capacity, but rather was offering the evidence to negate a required element of the charged offense. *See id.* We, therefore, considered the admissibility of the expert psychological evidence under our Rules of Evidence. *See id.*; N.H. R. Ev. 702, 704. We affirmed the trial court's ruling, holding that "the testimony of an expert psychologist on the ultimate issue of whether the defendant in fact formed or was capable of forming the requisite intent for the crimes charged will not aid the jury in its search for truth." *St. Laurent*, 138 N.H. at 495. We concluded that:

> The jury is capable of deciding the issue of intent without expert assistance. Jurors in their everyday lives constantly make judgments on whether the conduct of others was

intentional or accidental. The expert unquestionably has the ability to look at what the defendant said and did to form an opinion on whether the assault was done knowingly, but this is not beyond the ken of the average juror. Thus, it is the factfinder's responsibility to determine intent, not the expert's as a thirteenth juror. A psychological expert does not possess knowledge "superior" to that of the average person on the issue of intent. Therefore, we conclude that the trial court properly excluded the proffered testimony.

*Id.* (quotations, citations and ellipses omitted).

In the instant case, the defendant proposed to offer expert testimony during his bifurcated trial on his ability to form the requisite intent to commit the charged offense. The expert psychologist testified as to the defendant's mental capacity. He was not allowed to give his opinion as to whether the defendant's cognitive deficits rendered him incapable of acting purposely under the statute. *See* RSA 630:1-a. The trial court concluded that because New Hampshire does not recognize the diminished capacity defense, any argument that the defendant's cognitive deficits prevented him from forming the necessary intent to commit the charged offense was precluded.

As in *St. Laurent*, we conclude that the defendant was not advocating the adoption of a new criminal defense. The defendant offered the expert psychological testimony to negate an element of the first degree murder charge. He proposed that his expert testify that he could not form the intent necessary to commit the crime. The psychologist was allowed to testify as to the defendant's mental and cognitive deficits, an area in which the jury would need assistance. As to intent, however, as in *St. Laurent*, the defendant's "psychological expert does not possess knowledge 'superior' to that of the average person." *St. Laurent*, 138 N.H. at 495. Therefore, the trial court did not err by excluding the proffered testimony.

In light of this holding, we conclude that the defendant's constitutional rights were not violated. The defendant was allowed the opportunity to present expert psychological evidence regarding his mental capabilities, and also advanced an insanity defense in a bifurcated trial.

*Affirmed.*

NADEAU and DALIANIS, JJ., concurred.